**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OLIVIA ELEE<br>91 Macon Street, No. 2B<br>Brooklyn, NY 11216<br><br>     Plaintiff,<br><br>    v.<br><br>EHEALTH AFRICA<br>1200 G Street, NW, Suite 800<br>Washington, DC 20005<br><br> Serve:<br>  Regus Management Group LLC<br>  1200 G Street, NW, Suite 800<br>  Washington, DC 20005,<br><br>     Defendant. | Civil Action No. 1:18-cv-3152<br><br><br><br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

COMES NOW, Plaintiff OLIVIA ELEE, by her undersigned counsel, and complains about Defendant eHEALTH AFRICA as follows:

**NATURE OF THE CASE**

1. Plaintiff holds a master's degree in Public Health from Johns Hopkins University, and she worked in the health care industry for more than 14 years. In 2015, she began working for Defendant in Liberia on a project relating to Ebola Virus Disease. The project was funded through a $35 million grant from the U.S. Centers for Disease Control (the "CDC").

2. Plaintiff became concerned about how Defendant was spending CDC's money. For example, despite receiving CDC funds to do so, Defendant failed to pay employment taxes to the U.S. and Liberian governments. Defendant also used federal funds to advance wages

and loan money to employees, pay severance/settlements to employees, and pay contractors who Defendant knew were not performing the work for which they were paid.

3. Plaintiff complained to her immediate supervisor. When he failed to address the issues, Plaintiff elevated her complaints to Defendant's Executive Director.

4. Shortly thereafter, Defendant blocked Plaintiff's access to its offices, email, and documents, and then fired Plaintiff for unspecified performance issues and misconduct.

5. Plaintiff brings this action to recover damages for retaliation under the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA").

**JURISDICTION AND VENUE**

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3730 and 3732.

7. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant transacts business in and is incorporated under the laws of the District of Columbia.

**PARTIES**

8. Plaintiff is a U.S. citizen. During the relevant time period, Plaintiff was a resident of Ohio; however, she is currently a resident of New York.

9. During the relevant time period, Plaintiff was Defendant's employee and was entitled to the protections of the FCA.

10. Defendant is a not-for-profit corporation, incorporated in the District of Columbia, that purports to provide health care and emergency response services to underserved communities in Africa. On information and belief, Defendant's primary place of business is located at 1200 G Street, NW, Suite 800, Washington, DC 20005.

11. During the relevant time period, Defendant was Plaintiff's employer and was subject to the requirements and restrictions of the FCA.

## STATEMENT OF FACTS

12. On or about October 26, 2015, the CDC awarded Defendant a two-year grant entitled "Rapid Response to Ebola Virus Disease in West Africa through Strengthening of Surveillance Systems and Disruption of Chain of Transmission Interventions."

13. Defendant would collaborate with CDC country offices to accomplish the following project goals and strategies: eliminating human-to-human transmission of EVD and future serious health threats, including but not limited to, infectious disease outbreaks; strengthening capacity to conduct epidemiological surveillance; strengthening laboratory data management surveillance systems; and strengthening emergency management preparedness.

14. The grant provided Defendant approximately $35 million to perform work in Liberia, Nigeria, and Sierra Leone.

15. The CDC designated Defendant as a "high risk" organization, meaning that there was concern about Defendant's ability to meet performance and/or accountability requirements. Therefore, Defendant was required to obtain grant funds through a "manual drawdown" procedure. In summary, Defendant paid out-of-pocket for project expenditures and then requested reimbursement from the CDC.

16. Pursuant to the grant, Defendant was required to submit a monthly request for reimbursement of project costs. Requests were required to be supported by documentation, such as invoices, credit card statements, travel documents, and proof of payment. On information and belief, Defendant submitted monthly reimbursement requests to CDC's Atlanta Ebola Program Grants Manager and CDC's Liberian Deputy Country Director.

17. The grant included the following provision:

> Certification Statement: By drawing down funds, the grantee certifies that proper financial management controls and accounting systems, to include

personnel policies and procedures, have been established to adequately administer Federal awards and funds drawn down. Recipients must comply with all terms and conditions outlined in their [Notice of Award], including grant policy terms and conditions contained in applicable HHS Grant Policy Statements, and requirements imposed by program statutes and regulations and HHS grants administration regulations, as applicable; as well as any regulations or limitations in any applicable appropriations acts.

18. The Notice of Award stated: "NOTE 4: Please be advised that grantee must exercise proper stewardship over Federal funds by ensuring that all costs charged to their cooperative agreement are allowable, allocable, necessary and reasonable."

### *Defendant hired Plaintiff to work in Liberia.*

19. Plaintiff has a Bachelor's degree in Public Health and a Master's Degree in Public Health, both from Johns Hopkins University.

20. Plaintiff has more than 14 years of experience in the health care industry. She has worked for the World Bank and the World Health Organization, as well as private-sector employers.

21. In October 2015, Plaintiff accepted an offer to work for Defendant in Liberia on a CDC-funded project relating to Ebola Virus Disease.

22. Plaintiff began working for Defendant as a Program Manager in Liberia on November 18, 2015. Due to Plaintiff's excellent performance in that role and the temporary absence of her first-line supervisor, Country Director Aurelio Gomes, Defendant appointed Plaintiff as Acting Country Director for Liberia in or around the first week of December 2015.

### *Plaintiff questioned Defendant's failure to pay employment taxes.*

23. In December 2015, Plaintiff's staff complained to her about Defendant taking deductions from their paychecks. The employees informed Plaintiff that they never received pay stubs.

24. Plaintiff reviewed her own direct-deposit payments from Defendant and realized that no taxes were being deducted.

25. Defendant was supposed to pay employment taxes to the Liberian government for Plaintiff's staff members, who were Liberian citizens. However, Defendant was supposed to pay employment taxes to the U.S. government for Plaintiff and other American employees.

26. It is Plaintiff's understanding that the CDC provided Defendant funds to pay employment taxes for Defendant's employees who worked on the grant projects.

27. Plaintiff contacted Defendant's corporate Global Human Resources ("HR") Director Charles Spears and HR Lead Moibah Sheriff, and asked about the deductions from her employees' paychecks. She also asked for copies of paystubs for herself and her staff.

28. Defendant refused to give Plaintiff or her staff their paystubs. However, Defendant began deducting income tax from Plaintiff's paychecks in February 2016.

***Defendant used CDC funds to pay a contractor for work that was not performed.***

29. Defendant used CDC funds to pay CLAS Consults (hereinafter, "CLAS") around $3,000 or $4,000 per month to perform various work in connection with the CDC grant project.

30. For example, CLAS was responsible for obtaining residential and work permits from the Liberian government for Defendant's employees staffed to CDC-funded projects.

31. In or around late November or early December 2015, Country Director Gomes asked Plaintiff to check on a charge for a permit that Acting Finance Manager Francis Yancy had submitted for payment.

32. Specifically, CLAS billed Defendant $750 for a resident permit for one of Defendant's employees. Plaintiff believed the charge was too high and questioned Yancy about it. Yancy insisted that it was properly billed.

33. In or around December 2015 or January 2016, Plaintiff began questioning Defendant about the fees it was paying CLAS for the permits. Based on her previous experience working in

Africa, she believed CLAS was charging exorbitant fees for the permits.

34. On January 5, 2016, Plaintiff met with Gomes. Plaintiff told Gomes that she was very concerned about CLAS overcharging for permits, especially because CDC funds were used to pay for the permits.

35. According to the fee structure set forth by Liberia's Bureau of Immigration and Naturalization, and based on Defendant's not-for-profit status, the fee for a resident permit was $50. CLAS charged Defendant $750.

36. On January 31, 2016, Plaintiff emailed Gomes, Castle, Spears, Sherif, Yancy, Finance Manager Sylvester Watson, and Operations Manager Sulaiman Sesay regarding, among other things, her concerns about paying extra fees to CLAS for visas and permits. She asked why she was asked to sign off on purchase orders to pay CLAS thousands of dollars for permits that should have either been free or cost less than $100. Defendant did not address Plaintiff's concerns.

37. In March 2016, Plaintiff emailed Gomes, Castle, and Spears, to follow up on her complaints about CLAS overcharging for permits.

***Defendant used CDC funds to pay severance to and/or settle claims with employees.***

38. In or around February 2016, Gomes spoke to Plaintiff about firing an employee for misconduct. Gomes suggested that Defendant pay the employee for the rest of his contract. Plaintiff disagreed. Defendant had good cause to fire the employee, and paying him was neither necessary nor beneficial to the CDC's project.

39. Despite Plaintiff's objection, Defendant paid the employee a sum of $10,504.83. On information and belief, Defendant paid the money in exchange for the employee's agreement to release any claims he may have had against Defendant.

40. Defendant's financial records show that Defendant used CDC funds to pay the employee.

41. Gomes told Plaintiff that Castle made the decision.

42. On information and belief, Defendant used CDC funds to pay several other former employees in exchange for their agreement to release claims against Defendant.

### *Defendant used CDC funds for employee loans and salary advances.*

43. Defendant kept internal monthly records of costs and expenses under the CDC grant. These records indicate that Defendant used CDC funds to give employees loans or to advance their wages. For example, the records include the following entries:

| Date | Memo | Amount |
| --- | --- | --- |
| 7/30/2015 | Austin S. Doe – Salary Advance… | 500.00 |
| 11/30/2015 | Alvin Freeman Loan Repayment | 1,000.00 |
| 11/30/2015 | Amanda Jallah Loan Repayment | 400.00 |
| 12/31/2015 | Repayment of Employee Loan – Ali Kalau | 1,000.00 |
| 12/31/2015 | Trokon Adjavon Salary advance repayment | 300.00 |
| 12/31/2015 | Alvin Freeman Loan repayment | 1,000.00 |
| 12/31/2015 | Amanda Jallah Loan Repayment | 400.00 |
| 12/31/2015 | Moibah Sherif Loan Repayment | 800.00 |
| 2/29/2016 | Payment [of] Loan by Francis Yancy - February 2016 | 1,000.00 |
| 2/29/2016 | Payment of Loan by Oliver Jah - February 2016 | 400.00 |

44. When Plaintiff questioned Gomes about the salary advances and loans, Gomes responded that Castle approved the requests.

45. In or around February 2016, Project Manager Ali Kalau emailed Plaintiff to ask for approval of a loan for $4,000 or $5,000 to attend an online course. After examining the documentation about the course, Plaintiff felt it was inappropriate to approve the request, and responded to Kalau, stating that it was not Plaintiff's decision to make. Plaintiff copied

7

Castle on the email she sent to Kalau.  Castle sent an email, stating, "Approved."

46. On information and belief, Defendant submitted reimbursement requests to the CDC, through the drawdown process, for Kalau's online course, employee loans and salary advances, Doe's severance payment, and fees paid to CLAS, as described above.

### *Plaintiff complained about lack of proper vehicle registration and license plates.*

47. While traveling in one of Defendant's vehicles in or around late February and early March 2016, Plaintiff and her colleague were pulled over by police at a government road stop.  Police informed Plaintiff that the vehicle did not have appropriate license plates.

48. Plaintiff reported the issue to Gomes.  Defendant used CDC grant funds to pay CLAS to ensure that vehicles were properly licensed.  However, CLAS did not appear to be doing the work it was paid to do.

49. On or about April 12, 2016, Plaintiff and Executive Director Castle were in a car accident in one of Defendant's business vehicles.

50. After the accident, Plaintiff followed up with senior management to inquire about the vehicle records and license plate, which CLAS had still not been replaced.

51. The same day, Plaintiff informed Castle that CLAS was not providing the vehicle services they were paid for and that Defendant had already received a warning from Liberian government officials because CLAS failed to obtain proper license plates.

### *Defendant retaliated against Plaintiff.*

52. Six days later, on April 18, 2016, Gomes called Plaintiff into an unscheduled meeting for an impromptu performance evaluation.  Gomes told Plaintiff that things were "not working out" for her with Defendant.  Plaintiff asked for details, but Gomes would not provide any additional information.  Gomes did not give Plaintiff a written evaluation.

53. Gomes said that Castle wanted Plaintiff to work from home for the next month.

54. Plaintiff was shocked by the meeting. Only two weeks prior, Gomes had asked Plaintiff to represent Defendant at a future high-level meeting on April 25, 2016, with Liberian government officials and multinational stakeholders, including the Minister of Health and the head of the World Health Organization in the Liberia Country Office.

### *Defendant deactivated Plaintiff's access to her work email.*

55. On April 22, 2016, HR Director Spears sent Plaintiff a Google message, stating that things seemed like "they could spin out of control." When Plaintiff asked for clarification, Spears told her she did not need to come back into the office ever again.

56. Plaintiff asked Spears whether she would still represent Defendant at the meeting scheduled for the following week. Spears indicated that he did not know anything about it. Plaintiff asked Spears to confirm with Gomes that Plaintiff was no longer needed to represent Defendant at the meeting.

57. Plaintiff also asked about the expense reimbursement requests she submitted the previous week. Spears said that Plaintiff would be reimbursed for expenses. He also told Plaintiff that he believed her work email would be deactivated.

58. Defendant deactivated Plaintiff's work email just minutes later.

### *Defendant terminated Plaintiff's employment.*

59. After close of business on April 22, 2016, several of Plaintiff's staff members called her to say that they heard she was no longer working for Defendant. They were shocked and concerned about Plaintiff's sudden departure.

60. On April 23, 2016, someone posted a query on an online public forum for international expatriates in Liberia, asking for contact information for an international staff member who

worked for Defendant. Someone responded, providing Plaintiff's contact information. Shortly thereafter, one of Plaintiff's former colleagues posted that Plaintiff no longer worked for Defendant and that they should contact him.

61. Various stakeholders and community members contacted Plaintiff to ask what was happening and why Plaintiff was leaving her employment with Defendant.

62. On April 26, 2016, HR emailed Plaintiff and told her to vacate her apartment immediately and that Defendant would put her on a flight to the United States the following day.

63. Plaintiff responded that she had already scheduled travel in the region and could not fly back to the United States on April 27, 2016.

64. Defendant responded, stating that Plaintiff had to leave staff housing immediately. As directed, Plaintiff packed her belongings and returned the keys to Defendant by midnight.

65. On April 27, 2016, Plaintiff emailed Defendant to request a flight back to the United States on May 24, 2016. As a term of employment, Defendant was supposed to pay for Plaintiff's return travel to the United States. Plaintiff followed up with Defendant several times throughout April and May 2016 but did not receive a response confirming the flight arrangement. She ended up purchasing her own flight back to the United States.

66. On April 29, 2016, Spears emailed Plaintiff a letter, stating that her employment was terminated effective April 30, 2016, "for cause," specifically, for performance deficiencies and "interference with recruitment." However, no details were provided.

67. Despite Plaintiff's numerous complaints about CLAS, Castle appointed a CLAS employee as the Acting Country Director for Liberia on or about September 16, 2016.

***Defendant violated the CDC contract by failing to obtain approval for Plaintiff's firing.***

68. Pursuant to its grant contract, Defendant was required to obtain approval from CDC prior to

making any changes to senior leadership.

69. Plaintiff was a senior leader to whom this provision applied.

70. On information and belief, Defendant did not seek CDC's approval prior to terminating Plaintiff's employment, in violation of the contract with CDC.

### *Defendant made false statements regarding Plaintiff's wages.*

71. Plaintiff continued to request her pay stubs. In October 2016, Defendant finally sent Plaintiff pay stubs for February, March, and April 2016, only. Defendant also sent Plaintiff a document that showed her earnings during November and December 2015 and January 2016; however, it did not appear that any taxes had been deducted or that Defendant paid employment taxes to the U.S. government.

72. After Plaintiff returned to the United States, she filed a claim for unemployment benefits with the Ohio Department of Jobs and Family Services, Office of Unemployment Compensation (hereinafter, "Ohio Unemployment"), and reported her income from Defendant as follows:

| Time period | 10/01/2015–12/31/2015 | 01/01/2016–03/31/2016 | 04/01/2016–06/30/2016 |
|---|---|---|---|
| Wages | $11,438.50 | $24,000.00 | $8,000.00 |

73. However, Defendant reported Plaintiff's income to Ohio Unemployment, as follows:

| Time period | 10/01/2016–12/31/2016 | 01/01/2016–03/31/2016 | 04/01/2016–06/30/2016 |
|---|---|---|---|
| Wages | $0.00 | $32,000.00 | $0.00 |

74. On information and belief, Defendant never paid employment taxes to the U.S. federal or state governments for Plaintiff or its other American employees for the 2015 calendar year. Defendant never issued Plaintiff a W-2 form for 2015.

75. Ohio Unemployment determined that Defendant fired Plaintiff without just cause and

11

awarded Plaintiff unemployment benefits.

76. On information and belief, in October 2016, the Liberian Revenue Authority informed Defendant that they owed approximately $500,000 in unpaid income taxes.

77. Plaintiff's former colleague told Plaintiff that he discovered that Defendant did not pay the taxes deducted from employee paychecks to the Liberian government.

78. Shortly after the colleague raised the issue with Defendant, he was fired.

## COUNT 1
### *(FCA violation, 31 U.S.C. § 3730(h) – Retaliation)*

79. Plaintiff repeats and realleges paragraphs 1–78, as if fully set forth herein.

80. Plaintiff engaged in protected activity by taking actions to stop violations of 31 U.S.C. § 3721 *et seq*. Specifically, Plaintiff complained to Defendant about using and requesting federal funds to pay fees to contractors for work that was not performed, using and requesting federal funds to make loans to and pay severance to Defendant's employees, and failing to pay employment taxes to the U.S. and Liberian governments.

81. Plaintiff reasonably believed that Defendant was engaging in a pattern of conduct that violated the anti-fraud provisions of the FCA by presenting false claims for payment to the CDC; using false statements or certifications to obtain funding from the CDC; withholding monies received from the United States; and knowingly making, using, and/or causing to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the U.S. government.

82. Defendant knew that Plaintiff engaged in activity protected by the FCA.

83. Defendant terminated Plaintiff's employment in retaliation for her protected activity.

84. By and through its actions, Defendant violated the FCA.

85. As a result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including,

but not limited to, lost wages, benefits, and entitlements.

86. Pursuant to 31 U.S.C. § 3730(h), Plaintiff is entitled to: (a) reinstatement with the seniority status she would have had but for the retaliation; (b) two times the amount of back pay, plus interest on the back pay; and (c) compensation for special damages, including, but not limited to, litigation costs and reasonable attorney's fees.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor and against Defendant, and that the Court award Plaintiff reinstatement with the seniority status she would have had but for the retaliation; two times the amount of back pay, plus interest on the back pay; compensation for special damages, including, but not limited to, litigation costs and reasonable attorney's fees; compensatory damages; punitive damages; and any such other relief as is just and fair.

Dated: December 31, 2018                    Respectfully submitted,

ALAN LESCHT AND ASSOCIATES, P.C.

_____/s/_____
Alan Lescht [441691]
Sara McDonough [1022641]
1825 K Street, NW, Suite 750
Washington, DC 20006
Tel (202) 463-6036
Fax (202) 463-6067
alan.lescht@leschtlaw.com
sara.mcdonough@leschtlaw.com
*Counsel for Plaintiff*